IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALEXANDER JENKINS                               CV 05-631-PK

                  Plaintiff,                FINDINGS AND
                                                RECOMMENDATION
v.

BRIDGETT WHELAN, R.N., et. al..,

                  Defendants.

PAPAK, Magistrate Judge:

       Plaintiff, Alexander Jenkins, brings this case *pro se* against several officers, doctors and

healthcare personnel of the Oregon Department of Corrections (ODOC). This court construes

plaintiff's complaint as containing three separate Eighth Amendment claims: (1) a claim against

Dr. Steve Shelton, Dr. Jerry Becker, Dr. Greg Lytle, Dr. Carpenter[1], Bridgett Whelan R.N. and

Dorothy Wettlaufer R.N., all members of the medical staff of ODOC, for the denial of medical

---

[1]Dr. Carpenter is not an employee of the State of Oregon.  He was added as a defendant in
Jenkins' Amended Complaint (# 55).  There is no indication that Dr. Carpenter has been served
with the Amended Complaint and he has not entered an appearance.

Page 1 - FINDINGS AND RECOMMENDATION

treatment for Jenkins' knee injury; (2) a claim against Gregory Ransier and Corporal Kenneth

Hearn, security staff corrections officers of ODOC, for ordering Jenkins to move into an upper

tier cell, causing him to fall and injure himself, on December 23, 2004; and (3) a claim against

ODOC Director Max Williams, Assistant Director Stan Czerniak, Superintendent Brian

Belleque, Superintendent Guy Hall, Captain James Deacon, Captain Sonny Rider, Captain

Brandon Kelly, Executive Assistant Aleca Nelson and Executive Support Staffer Linda Schutt

for failing to protect Jenkins from an assault on November 3, 2005, and failing to supervise

defendants Ransier and Hearns for the incident described above in claim (2).

Defendants, collectively, filed a motion for summary judgment. For the reasons set forth

below, I recommend that defendants' motion for summary judgment be denied as to Drs. Shelton

and Lytle and granted as to all other defendants named in the first claim, and that summary

judgment be granted as to all defendants named in the second and third claims.

## SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary

judgment:

> if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the district court's role

is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Freeman v. Arpaio*, 125 F.3d 732,

735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322-23; *see also Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989); *Harper*, 877 F.2d at 731. The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Anderson*, 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045.

In evaluating a motion for summary judgment, the court must construe all facts and draw all inferences in the light most favorable to the non-moving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g. Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

**FACTUAL BACKGROUND**

Page 3 - FINDINGS AND RECOMMENDATION

Jenkins was an inmate of the ODOC and served his sentence in ODOC custody from November 18, 2002 to October 4, 2006, when he was paroled. Before his conviction and formal sentencing, Jenkins was in the custody of Multnomah County from early May 2002 to June 20, 2002, when he was released into the community awaiting trial. On August 29, 2002, Jenkins was convicted and detained in the Multnomah County jail until he was transferred into ODOC on November 18, 2002.

On May 7, 2002, Jenkins reported to the Multnomah County jail healthcare personnel that he had injured his right knee two days earlier. He reported that he had slipped on water while cleaning his cell when the toilet overflowed. X-rays were taken, which revealed no fracture or misalignment. Jenkins was given a sleeve for his knee and aspirin for pain management.

On June 11, 2002, Jenkins was examined by Dr. Albright, an orthopedic specialist. Dr. Albright diagnosed Jenkins with a medial meniscus tear and recommended an MRI. If the MRI confirmed a tear, Dr. Albright then recommended arthroscopic surgery on the knee, and scheduled a follow-up appointment for June 20, 2002. Jenkins, however, was transferred to Clackamas County jail on June 12, 2002, transferred back to Multnomah County on June 16, 2002 and released into the community on June 20, 2002, before an MRI was done.

On July 4, 2002, while living in the community, Jenkins reported to OHSU's emergency room, complaining that his knee was locking up and causing pain. An orthopedic specialist recommended surgery that same day but Jenkins declined because he needed to get back to the homeless shelter where he was staying. A follow up appointment was made at the OHSU, but a problem arose with Jenkins' medical card and OHSU called Jenkins and told him they couldn't treat him.

Page 4 - FINDINGS AND RECOMMENDATION

After Jenkins was convicted and returned to the Multnomah County jail, he renewed his request for an MRI. On October 9, 2002, Jenkins was examined by Dr. Todd Engstrom. Jenkins reported his right knee "popping," locking and grinding. Dr. Engstrom examined Jenkins and reviewed Dr. Albright's notes and agreed that Jenkins needed surgery. However, he mentioned that timing would be problematic since Jenkins' sentencing hearing was approaching and Jenkins would be transferred into ODOC's custody.

After sentencing and admission into ODOC's custody, Jenkins was seen by ODOC healthcare personnel on November 20, 2002, where he reported his knee injury and requested an MRI and knee surgery. In response, Jenkins was placed on a lower-bunk, lower-tier restriction for two months. The MRI request was sent to the Therapeutic Level of Care Committee (TLC). The TLC is comprised of the ODOC Medical Director, Dr. Steve Shelton, and one or more ODOC practitioners, and reviews requests for treatment that are medically acceptable practices but not medically necessary.[2] An MRI has been determined by the TLC to be a Level 3 priority health care procedure in accordance with priorities established by the Medical Director and set out in ODOC Administrative Rules. Level 3 procedures are classified as medically acceptable but not medically necessary care and treatment for a nonfatal condition. After review, the TLC denied the MRI, noting that the patient's pain was not consistent with a torn cartilage. This denial was explained to Jenkins and he was informed he could purchase his own healthcare. Jenkins continued to receive aspirin for pain management and a low bunk restriction.

On December 9, 2002. Jenkins sent an Inmate Communication to Health Services stating that the aspirin and anti-inflammatories were not controlling his pain. No change in treatment

_____

[2]It is not clear from the pleadings who exactly served on the TLC at the time.

Page 5 - FINDINGS AND RECOMMENDATION

was made.

Over the next three years, Jenkins was transferred to various facilities in the custody of ODOC. During that time, Jenkins saw numerous health care providers concerning his knee pain as well as other pains of which he complained, including back pain and head injuries. In response to his complaints, Jenkins received lower-bunk, lower-tier restrictions, work restrictions, "no-stairs" restrictions, ice treatments, and aspirin to manage his pain. He reported falling numerous times as a result of his knee locking up and complained that the medication was not alleviating his pain.

On August 23, 2004, Jenkins was examined by a physician at Shutter Creek Correctional Institution (SCCI). The physician's assessment was that Jenkins had a right lateral meniscus tear in his knee that would eventually require an MRI, plus right side sciatica. The physician ordered a flat surface restriction for five months, no supine bike exercises for five months, and an increase in his aspirin. Jenkins was placed on medical idle status, meaning he was to remain on his bunk and rest except for bathroom breaks.

On September 17, 2004, Jenkins was examined by a health care provider who diagnosed possible cartilage injury to the knee. There was no change in treatment.

On December 7, 2004, Jenkins was examined by Dr. Jerry Becker at the Oregon State Correctional Institution (OSCI), who recommended an MRI to rule out meniscus derangement versus traumatic fat pad syndrome. On December 21, 2004, Jenkins received an MRI, which revealed  a medial meniscus tear and a blister type lesion in the right femur.

On December 23, 2004, corrections officers Gregory Ransier and Corporal Kenneth Hearn ordered Jenkins to move from a lower-tier bunk to an upper-tier bunk. Jenkins' current

Page 6 - FINDINGS AND RECOMMENDATION

bunk was needed for a suicidal inmate. Jenkins informed Ransier and Hearn of his lower-tier, lower-bunk restriction. Hearn checked with health services and found no restrictions. Ransier checked with master control a second time and found no restrictions. In the process of moving to an upper tier and upper bunk, Jenkins fell and hit his head after his knee gave out.[3] Through an Inmate Communication form, Jenkins reported this incident. Captain Deacon responded that records showed Jenkins was on a lower-tier restriction, and Jenkins should speak with staff if this happened again.

On January 7, 2005, Dr. Carpenter, an orthopedic surgeon, examined Jenkins and reviewed the results of the December 21, 2004 MRI. His assessment was an internal derangement of the right knee with what appeared to be a benign cyst. A bone scan was ordered that, if normal, would proceed to arthroscopic examination of the right knee. On March 1, 2005, arthroscopic surgery was performed. An ace wrap was issued to Jenkins to use to support his knee. At his follow-up appointment with the surgeon, Jenkins requested a knee brace. Dr. Carpenter provided one but said it was not medically necessary. Because the brace had metal stays in it, the brace was returned to the surgeon's office because it was not authorized in the facility and there was no medical indication that Mr. Jenkins needed to use a knee brace.

On March 4, 2005, Jenkins filed this complaint in the district court, generally alleging violations of his Fifth, Eighth, and Fourteenth Amendment rights by various ODOC officials, guards, healthcare personnel, nurses, doctors, and unnamed defendants.

---

[3]There is some disagreement about this. Jenkins claimed he fell and hit his head, while both the affidavits of Ransier and Hearn state that Jenkins never fell in their presence. Aff. of Kenneth Hearn, ¶¶ 6-9 and Ex. 103, Aff. of Gregory Ransier, ¶¶ 6-9. For purposes of summary judgement, the court accepts Jenkins' allegations as true.

On March 22, 2005, Jenkins was examined by Dr. Greg Lytle. Dr. Lytle observed no swelling of the knee, but ordered lower-bunk restriction for one year and a pull on brace containing no metal for Jenkins' knee. Over the next few months, Jenkins continued to report knee pain, but examinations revealed no swelling and that Jenkins was ambulating well. Jenkins continued to receive aspirin and bunk restrictions.

Throughout 2005, Jenkins reported chronic back pain to the healthcare personnel at ODOC. His pain medication was changed several times at Jenkins' request. He continued to receive aspirin. X-rays taken in late 2004 revealed only mild degenerative changes of his lower spine, which is apparently normal as a patient ages.

On September 27, 2005, Dr. Lytle examined Jenkins in response to his back pain complaints. Dr. Lytle increased his aspirin prescription and referred the matter to the TLC for consideration of an MRI of the lower spine. The TLC denied the request for an MRI and recommended that conservative treatment be continued. Sedentary work restriction was ordered.

On November 1, 2005, Jenkins was transferred from the Two Rivers Correctional Institution (TRCI) to the Oregon State penitentiary (OSP) to see Dr. Jerry Becker regarding his chronic low back pain. On November 2 and 3, 2005, Jenkins claims he was assaulted by another inmate. Jenkins was treated for a laceration on his head and received sutures for one of the alleged assaults.

On February 23, 2006, Dr. Lytle examined Jenkins for complaints of chronic, right-sided low pack pain. Dr. Lytle concluded that Jenkins had chronic right sciatic joint pain. Jenkins refused a steroid injection. Jenkins again refused a steroid injection when it was offered to him on March 7, 2006.

Page 8 - FINDINGS AND RECOMMENDATION

Over the next few months until his release, Jenkins was seen primarily for medication adjustments, but there was no significant change in treatment related to his complaints of chronic right knee pain and chronic low back pain.

## ANALYSIS

In civil rights cases involving a plaintiff proceeding *pro se*, this court construes the pleadings liberally and affords the plaintiff the benefit of any doubt. *Karim-Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 623 (9th Cir. 1988).

**I. First claim for relief**

**A. Deliberate Indifference**

*(i) Standard*

A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976), *Toussaint v. McCarthy,* 801 F.2d 1080, 1111 (9th Cir. 1986). A determination of deliberate indifference involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) *overruled on other grounds by WMX Techs., Inc., v. Miller*, 104 F.3d 1133 (9th Cir. 1997)(en banc). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* at 1059 *citing Estelle*, 429 U.S. at 104.[4] Second, the plaintiff must show that defendant's response to the need

---

[4]The parties do not dispute that Jenkins' knee injury constituted a serious medical need. While some courts have held that a medial meniscus tear is not a serious medical need, *see Moody v. Pickles*, 2006 WL 2645124, *6 (N.D.N.Y. 2006), I find that Jenkins' knee injury was a

was deliberately indifferent. This can be satisfied by showing (1) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Id.* Indifference, "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* at 1059-1060. However, if the harm is an "isolated exception" to the defendant's "overall treatment of the prisoner," it normally militates against a finding of deliberate indifference. *Id.* at 1060.

The crucial question for an Eighth Amendment claims remains whether the official's action rises to a constitutional violation. Mere malpractice, or even gross negligence, does not suffice to establish deliberate indifference. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). A dispute between a prisoner and a prison official over the necessity or extent of medical treatment does not raise an claim under 42 U.S.C. §1983. *See, e.g., Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971); *Mayfield v. Craven*, 433 F.2d 873 (9th Cir. 1970). Furthermore, the Ninth Circuit has applied this principle to disputes between physicians, so that a difference of medical opinion over appropriate medical treatment does not amount to deliberate indifference to serious medical needs. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2003); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). In other words, "where the defendant has based his action on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson*, 90 F.3d at 332.

serious medical condition and focus on the second prong of the deliberate indifference test.

Page 10 - FINDINGS AND RECOMMENDATION

*(ii) Personal involvement of the parties*

Liability under §1983 arises only upon a showing of personal participation by the defendant. *Taylor*, 880 F.2d 1040. To prevail in an Eighth Amendment claim, the plaintiff "must prove (1) that the specific prison official, in acting or failing to act, was deliberately indifferent to the mandates of the Eighth Amendment and (2) that this indifference was the actual proximate cause of the deprivation of the inmates' Eighth Amendment right to be free from cruel and unusual punishment." *Leer v. Murphy*, 844 F.2d 628, 643 (9th Cir. 1988). In short, for a defendant to be liable, he must be personally involved and causally connected to the deprivation of the inmates' Eighth Amendment right.

Jenkins filed an Eighth Amendment claim for deliberate indifference to his medical needs against defendants Dr. Steve Shelton, Dr. Jerry Becker, Dr. Greg Lytle, Dr. Carpenter, Bridgett Whelan R.N and Dorothy Wettlaufer R.N. This court construes Jenkins' claim to center on the denial of his request for an MRI and the subsequent delay in, and inadequacy of, treatment provided.

Jenkins has stated sufficient facts to causally connect Dr. Shelton and Dr. Lytle to his Eighth Amendment claims. As the Medical Director of ODOC and a member of the TLC committee, Dr. Shelton was personally involved in the decision to deny Jenkins' MRI request. Likewise, as the Chief Medical Officer at the Two Rivers Correctional Institution and keeper of the medical records, Dr. Lytle was also intimately involved with the treatment provided to Jenkins.

The Eighth Amendment claims against remaining defendants Dr. Becker, Dr. Carpenter, Whelan and Wettlaufer should be dismissed because Jenkins fails to establish a sufficient causal

Page 11 - FINDINGS AND RECOMMENDATION

connections between the actions of these defendants and the deprivation of his Eighth

Amendment rights. As nurses, neither Whelan nor Wettlaufer were responsible for, or played a

role in, the medical decisions concerning the delay of an MRI and arthroscopic surgery for

Jenkins' knee. Without this decision-making ability, the claims against Whelan and Wettlaufer

are properly dismissed. Dr. Becker's involvement is likewise limited. The record shows that Dr.

Becker's first involvement with Jenkins was when he examined Jenkins on December 7, 2004.

Dr. Becker recommended an MRI and surgery, which Jenkins subsequently received. There is no

indication that Dr. Becker's actions in recommending an MRI and surgery played any part in an

Eighth Amendment claim; therefore, the claim against him is dismissed. Likewise, Dr.

Carpenter's only involvement was in performing the surgery on Jenkins' knee. Considering

Jenkins does not complain about the surgery provided, or tie the surgery to an Eighth

Amendment claim, the claim against Dr. Carpenter is properly dismissed.

   *(iii) Analysis*

   With the recommended dismissal of  Dr. Becker, Dr. Carpenter, Whelan and Wettlaufer

from Jenkins' first claim, only Dr. Shelton and Dr. Lytle  remain.

   Though the standard for deliberate indifference is stringent, a reasonable jury could find

that Jenkins has met this standard in this case. *McGuckin* establishes the two elements of the

deliberate indifference test: the seriousness of the prisoner's medical need and the nature of the

prison official's response to that need. It is undisputed that Jenkins' knee injury constituted a

"serious medical need": it caused prolonged pain, a number of falls, work restrictions, and

eventually required surgery. Therefore, the claim rests on the nature of ODOC's response to that

injury.

Based on the record of treatment received by Jenkins for his knee injury, there exists a genuine question of material fact on whether the actions taken (or not taken) by Shelton and Lytle amounted to "deliberate indifference." Shelton and Lytle argue that there were two approaches to treating Jenkins' knee injury: a conservative approach consisting of observation and pain medication, and a more aggressive approach, consisting of arthroscopic surgery. "Where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson*, 90 F.3d at 332. However, Shelton and Lytle have failed to establish that two "medically acceptable" alternatives existed.

The starting point of Jenkins' deliberate indifference claim begins with the TLC's denial of Jenkins' request for an MRI. In this denial, the TLC offered little reasoning behind the decision, only that Jenkins' "pain pattern isn't consistent with torn cartilage."  No examination of Jenkins' knee was made by the TLC. Moreover, the TLC failed to remark or consider the independent recommendations of Dr. Albright and Dr. Engstrom, both of whom concluded that Jenkins needed an MRI and surgery. Instead the TLC recommended to "wait and observe." Nowhere in any of the pleadings do the defendants provide evidence that "wait and observe" is a medically acceptable alternative to surgery for a torn meniscus. Even the Independent Medical Evaluation (IME) performed by Dr. Thad Stanford, which was filed by defendant's in support of this motion for summary judgment, does not indicate that waiting and observing Jenkins' knee was an acceptable course of treatment.[5] In this court's view, Shelton and Lytle have failed to

---

[5]Dr. Stanford's IME, which is one and a half pages long, concludes that treatment of Jenkins met "community standards." However, the only "treatment" which Dr. Stanford discusses was the arthroscopic surgery performed by Dr. Carpenter. Dr. Stanford fails to address the three years during which Jenkins regularly requested an MRI and arthroscopic repair, and during which

Page 13 - FINDINGS AND RECOMMENDATION

establish, at least at this stage of the proceedings, that this is a case concerning a difference of

medical opinion. It appears, based on the record, that this is a case of a clearly established

treatment regimen (MRI and surgery) that was continually denied by the TLC without sound

reasoning.

      The records herein indicate that reasonable minds could disagree on whether Shelton or

Lytle acted with deliberate indifference towards Jenkins' injury. The medical records, inmate

communication forms, and Affidavit of Greg Lytle reveal that, from May 2002 until September

2006, Jenkins regularly utilized the medical services of the prison. Though he did complain of

various pains, most of his complaints were related to either knee pain or injuries that occurred as

a result of his knee locking or giving out. This pain significantly affected Jenkins' daily activities,

as he could not climb stairs or work on wet surfaces. Jenkins was provided with pain medication

and work and bunk restrictions, but such actions by Shelton and Lytle do not necessarily preclude

a finding of deliberate indifference. *See Lavender v. Lampert*, 242 F. Supp.2d 821, 843 (D.Or.

2002) (summary judgment inappropriate on a deliberate indifference claim even when defendants

provided pain medication and regularly examined prisoner).

      Jenkins clearly suffered needless pain–pain that could have been easily eliminated by a

simple outpatient procedure–for the two and a half years in which Shelton and Lytle denied his

requests for an MRI and surgery. They were well aware of Jenkins' pain, yet offered only  pain

medication. This consistent pattern of treatment over a prolonged period of time, coupled with

Shelton and Lytle's knowledge of Jenkins' diagnosis and pain, raises fact questions on whether

Shelton and/or Lytle were deliberately indifferent to Jenkins' medical needs. *See Hathaway v.*

---

he was in continual pain and subject to right knee popping, locking and grinding.

Page 14 - FINDINGS AND RECOMMENDATION

*Couglin,* 37 F.3d 63, 68 (2d Cir. 1994) (finding "[a] jury could infer deliberate indifference from the fact that [the doctor ] knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] situation.") *cited in Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006). A reasonable juror could conclude that the delay was deliberate and that it caused Jenkins to suffer "unnecessary and wanton infliction of pain." *See Estelle,* 429 U.S. at 104; *Hunt v. Dental Department*, 865 F.2d 198, 200 (9th Cir. 1989).

Shelton and Lytle further argue that even if there was a delay in treatment, Jenkins cannot establish a deliberate indifference claim because his injury was not made worse by the delay.[6] Shelton and Lytle  rely on the opinions of Dr. Stanford and Dr. Lytle, both of whom concluded that the two and a half year delay in surgery did not cause any further deterioration of the knee joint. While this may be true, when the delay arguably creates other medical problems, it is sufficient to establish deliberate indifference. *See Hunt,* 865 F.2d at 200 (deliberate indifference claim established by a three month delay in replacing dentures, causing weight loss and gum disease). Neither Dr. Stanford or Dr. Lytle specifically addressed the chronic back pain from which Jenkins suffered–back pain that only developed after Jenkins' knee injury. Though a link has not been affirmatively established between the knee pain and back pain, it is reasonable to conclude that favoring the right knee when walking and regularly falling as a result of a knee locking up, could be linked to the development of chronic back pain and problems with the sciatic nerve. At the least, this presents a factual question for the jury.  Summary judgment as to

---

[6]There is some case law to suggest that failure to adequately treat chronic pain, alone, as a result of the delay or denial of treatment, is sufficient to state a deliberate indifference claim. *See Lavender*, 242 F. Supp.2d at 842-43; *Delker v. Maass*, 843 F. Supp 1390, 1395 (D.Or. 1994).

Jenkins' first claim for relief against Drs. Shelton and Lytle should therefore be denied.

**B. Qualified Immunity**

*(i) Standard*

"Government officials who perform discretionary functions are protected from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lum v. Jensen*, 876 F.2d 1385, 1396 (9th Cir. 1989), *cert. denied,* 493 U.S. 1057 (1990), *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Ninth Circuit established a two-step inquiry into the application of qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court must determine whether "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Id.* at 201. If the plaintiff's allegations add up to a violation of constitutional rights, the second question is whether the right was "clearly established": whether the contours of the right were defined with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. *Id.* In determining whether a constitutional right is "clearly established,"  the critical inquiry is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Id.* at 202. If the law did not put the government official on notice that his actions would be unlawful, then summary judgment is appropriate. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (Qualified immunity protects all government officials "but the plainly incompetent or those who knowingly violate the law.").

*(ii) Analysis*

Shelton and Lytle  maintain that they are qualifiedly immune from liability because, in

choosing a conservative treatment course, they were not put on notice that they were violating

Jenkins' rights. Viewed in light most favorable to Jenkins, the record demonstrates that there was

a violation of Jenkins' Eighth amendment right. Therefore, the question is whether the "contours"

of the right are "sufficiently clear that a reasonable official would understand that what he is

doing violates that right." " *Lavender,* 242 F. Supp.2d at 844 *quoting Saucier*, 533 U.S. at 201.

These "contours" were clearly established in *McGuckin*: the "existence of chronic and substantial

pain" itself demonstrates a serious medical need. *Lavender*, 242 F. Supp 2d at 845, *quoting*

*McGuckin*, 974 F.2d at 1060. Therefore, "any reasonable official would understand that to deny

or delay treatment for such pain, or to ignore it, would constitute deliberate indifference to a

serious medical condition, and therefore violate the Eighth Amendment prohibition against cruel

and unusual punishment." *Lavender*, 242 F. Supp at 845.

Shelton and Lytle further argue that by choosing a conservative course of treatment, they

were hardly on notice that a constitutional right was violated. However, as previously addressed,

Shelton and Lytle have failed to prove that their response to Jenkins' serious condition was a

medically acceptable course of treatment. Rather, this is a case where Shelton and Lytle were

fully aware of Jenkins' injury and diagnosis, the pain and complications of that injury, and

Jenkins' repeated requests for an MRI and surgery. Based on the record before me, I cannot

conclude that Shelton or Lytle are protected by qualified immunity. *See Delker,* 843 F. Supp at

1398 (D.Or. 1994) (finding no entitlement to qualified immunity when doctor was "fully aware

of plaintiff's injury, knew plaintiff was suffering pain and anxiety as a result of that injury, knew

an operation would likely alleviate plaintiff's symptoms, and knew plaintiff had repeatedly

requested such an operation," but denied the surgery).  I therefore recommend that Drs. Shelton

and Lytle's request for summary judgment based on qualified immunity be denied.

## II. Second claim for relief

Jenkins' second claim concerns an incident that occurred on December 23, 2004, while he was incarcerated. Jenkins alleges that defendants Ransier and Hearn violated his Eighth Amendment rights when they required him to move to an upper-tier bunk despite his injured knee. For Jenkins' Eighth Amendment rights to have been violated, Ransier and Hearn must have acted with deliberate indifference when they moved him to an upper-tier bunk. To establish deliberate indifference, Ransier and Hearn must have consciously disregarded Jenkins' health and safety, a subjective state of mind close to criminal recklessness. *Farmer v. Brennan*, 511 U.S. 525, 839-840 (1994).

Jenkins has offered no evidence, only unsupported allegations, that Ransier and Hearn consciously disregarded his safety by moving him to an upper-tier. In fact, the record demonstrates the opposite. Both Ransier and Hearn called to verify Jenkins' statement that he was on lower-tier restrictions. After checking on this twice, they found no such restriction. In the absence of such a restriction, Jenkins cannot establish that Ransier and Hearn knew of his condition and deliberately ignored it. In a similar case, the Eastern District Court of Texas found that defendant prison officers were not subject to an Eighth Amendment claim when they disciplined plaintiff-prisoner for failing to sit in the "props" position as required by the program, despite plaintiff's claim he had a medical restriction on sitting in that position. *James v. Carlson*, 2007 WL 1231804, *4 (E.D.Tex. 2007). The court in *James* found that "because the medical records offered no basis on which the Defendants could have known that [plaintiff] could not comply" with such orders, there was no Eighth Amendment violation. *Id.* The court observed that

defendants "had no obligation to believe [plaintiff's] description of his medical condition over that of medical professionals who completed his classification chart." *Id.*

Whether the omission of the lower-tier restriction on Jenkins' record was the fault of medical services failing to note it, Jenkins' failure to request it, or a simple mistake, it cannot be

established that Ransier and Hearn knew of the risk to Jenkins and consciously disregarded it.

*See id.* Therefore, summary judgment should be granted as to Jenkins' second claim against

defendants Ransier and Hearn.

## III. Third claim for relief

Plaintiff's third claim for relief is against defendants Williams, Czerniak, Belleque, Hall,

Deacon, Rider, Kelly Nelson, and Schutt (hereinafter "Defendants Williams, et. al.") for failure to

supervise defendants Ransier and Hearn concerning the incident described in the second claim

for relief, and for failing to protect Jenkins from an assault that occurred on November 3, 2005.

## A. Failure to Supervise

Plaintiff includes defendants Williams, et. al. because they were acting in some sort of

supervisory capacity over Ransier and Hearn during the incident on December 23, 2004, or

responded to complaints raised by plaintiff with regards to the incident. In order to establish a

civil rights claim under 42 U.S.C. §1983, defendant's conduct must have a sufficiently close

relationship to the claimed violation of the plaintiff's rights in order to conclude that the

defendant "subjected" the plaintiff "to the deprivation" of federally protected rights. *Martinez v.*

*California*, 444 U.S. 277, 285 (1980). State officials may not be liable under §1983 on a

*respondeat superior* theory unless they play an affirmative part in the alleged deprivation. *Rizzo*

*v. Goode*, 423 U.S. 362, 376-76 (1976); *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir. 1987); *see*

*also Hansen v. Black*, 855 F.2d 642, 646 (9th Cir. 1989) (holding that a supervisor may be liable

based on his personal involvement in the alleged deprivation, or if there is a sufficient causal

connection between the supervisor's alleged wrongful conduct and the alleged deprivation).

Jenkins has not alleged enough specific facts to demonstrate that, as supervisors,

Page 20 - FINDINGS AND RECOMMENDATION

defendants Williams, et. al. played an affirmative role in Jenkins' movement by Ransier and
Hearn to an upper-tier bunk. Without any affirmative act in the alleged deprivation, supervisors
cannot be held liable under §1983. *King*, 814 F.2d at 568.  Jenkins has provided no evidence that
any of the defendants Williams, et. al. ordered the move or participated in the move.
Furthermore, as discussed above, since there was no constitutional violation in the conduct of
Rainsier and Hearn, these defendants cannot be liable for the supervision of that conduct.
Summary judgment should therefore be granted as to defendants Williams, et. al.

**B. Failure to Protect**

Jenkins' failure to protect claim stems from incidents on November 2 and 3, 2005, in
which Jenkins claims he was assaulted by another inmate at OSP. This was not the first fight in
which Jenkins was involved – the record indicates Jenkins' was a regular participant in
altercations with fellow inmates, often stemming from Jenkins' role as an informant. Though he
had previously been on administrative segregation,[7] Jenkins was not in that status at the time of
the assaults. Jenkins alleges that prison officials knew that he would be assaulted at OSP and
deliberately transferred him there. He also alleges that officials ignored or covered up the
assaults.

It is well-established that "prison officials have a duty...to protect prisoners from violence
at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. at 833 *quoting Cortes-Quinones v.
Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1998). However, not every assault suffered by an
inmate at the hands of another inmate rises to the level of a constitutional violation. For a claim
based on the failure to prevent harm, the inmate must show that he is incarcerated under

The record indicates that Jenkins was on administrative segregation from September until
December of 2004. That order was not renewed.

conditions posing a substantial risk of harm. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). More importantly, it must be shown that prison officials knew of and consciously disregarded an excessive risk to inmate's safety. *Farmer*, 511 U.S. at 837.

Jenkins' failure to protect claim fails because he has not alleged specific facts from which defendants Williams, et. al. could infer that other prisoners posed a substantial risk of serious harm to him. *See Id.*, 511 U.S. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). Jenkins has made vague allegations that the defendants Williams, et. al. were part of a conspiracy to expose him to assault because of his previous role as an informant. There is no evidence of this conspiracy beyond Jenkins' allegations.[8] He has expressed a generalized fear of attack, but has failed to state which defendant was put on notice of the potential for assault, and to what degree of specificity said defendant was put on notice. *See Beauclair v. Graves*, 2007 WL 1482393, *3 (10th Cir. 2007) (holding that despite plaintiff-prisoner's request to be transferred for fear of safety, failure to protect claim fails because plaintiff failed include enough facts to show that plaintiff faced a serious risk of harm from other inmates). Jenkins' allegations are not specific enough to establish that any of the defendants Williams, et. al. had knowledge of the risk of substantial harm posed to Jenkins by other prisoners. For instance, when a plaintiff presents evidence showing that a substantial risk of inmate attack was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" then the plaintiff can survive summary judgment. *Id.* at 842-843. Jenkins has provided no such comparable evidence.

Likewise, Jenkins cannot establish that officials ignored, failed to respond to, or

---

[8]As stated previously, the evidence indicates that Jenkins was transferred to OSP for a medical examination related to his claim of lower back pain.

otherwise covered up the assault. Additional discovery filed on July 26, 2007, reveals that there

was a full and thorough investigation of the November 3 incident. The prison officers and inmate

alleged to be involved were interviewed, Jenkins was subsequently placed in administrative

segregation, and the Inspector General found no evidence to support Jenkins' allegations of a

conspiracy or a coverup.

Summary judgment is therefore appropriate on Jenkins' failure to protect Eighth

Amendment claim.

## CONCLUSION

For the reasons set forth above, defendants Motion for Summary Judgment (# 71), should

be DENIED as to Jenkins' first claim for relief against Drs. Shelton and Lytle and GRANTED as

to all other defendants named therein; and GRANTED as to Jenkins' second and third claims for

relief.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District

Judge for review.  Objections, if any, are due August 15, 2007.  If no objections are filed, review

of the Findings and Recommendation will go under advisement on that date.  If objections are

///

///

///

///

///

///

Page 23 - FINDINGS AND RECOMMENDATION

filed, a response to the objections is due fourteen days after the date the objections are filed and

the review of the Findings and Recommendation will go under advisement on that date.


Dated this 1st day of August, 2007.



 /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge